# EXHIBIT 3

# DEPARTMENT OF THE INTERIOR

## Fish and Wildlife Service

### 50 CFR Part 17

[Docket No. FWS–R9–IA–2011–0027; FF09A30000 123 FXIA16710900000R4]

RIN 1018–AW81

**Endangered and Threatened Wildlife and Plants; U.S. Captive-Bred Inter-subspecific Crossed or Generic Tigers**

**AGENCY:** Fish and Wildlife Service, Interior.

**ACTION:** Final rule.

**SUMMARY:** We, the U.S. Fish and Wildlife Service (Service), are amending the regulations that implement the Endangered Species Act (Act) by removing inter-subspecific crossed or generic tiger *(Panthera tigris)* (*i.e.,* specimens not identified or identifiable as members of Bengal, Sumatran, Siberian, or Indochinese subspecies *(Panthera tigris tigris, P. t. sumatrae, P. t. altaica,* and *P. t. corbetti,* respectively)) from the list of species that are exempt from registration under the Captive-bred Wildlife (CBW) regulations. The exemption currently allows those individuals or breeding operations who want to conduct otherwise prohibited activities, such as take, interstate commerce, and export under the Act with U.S. captive-bred, live inter-subspecific crossed or generic tigers, to do so without becoming registered. We make this change to the regulations to strengthen control over commercial movement and sale of tigers in the United States and to ensure that activities involving inter-subspecific crossed or generic tigers are consistent with the purposes of the Act. Inter-subspecific crossed or generic tigers are listed as endangered under the Act, and a person will need to obtain authorization under the current statutory and regulatory requirements to conduct any otherwise prohibited activities with them.

**DATES:** This rule becomes effective on May 6, 2016.

**ADDRESSES:** The supplementary materials for this rule, including the public comments received, are available at *http://www.regulations.gov* at Docket No. FWS–R9–IA–2011–0027. You may obtain information about permits or other authorizations to carry out otherwise prohibited activities by contacting the U.S. Fish and Wildlife Service, Division of Management Authority, Branch of Permits, 5275 Leesburg Pike, MS–IA, Falls Church, VA 22041–3803; telephone: 703–358–2104 or (toll free) 800–358–2104; facsimile: 703–358–2281; email: *managementauthority@fws.gov;* Web site: *http://www.fws.gov/international.*

**FOR FURTHER INFORMATION CONTACT:** Timothy J. Van Norman, Chief, Branch of Permits, Division of Management Authority, U.S. Fish and Wildlife Service, 5275 Leesburg Pike, MS–IA, Falls Church, VA 22041–3803; telephone 703–358–2104; fax 703–358–2281. If you use a telecommunications devise for the deaf (TDD), call the Federal Information Relay Service (FIRS) at 800–877–8339.

**SUPPLEMENTARY INFORMATION:**

## Background

To prevent the extinction of wildlife and plants, the Endangered Species Act of 1973, as amended (16 U.S.C. 1531 *et seq.*) (Act), and its implementing regulations in title 50 of the Code of Federal Regulations (CFR), prohibit any person subject to the jurisdiction of the United States from conducting certain activities with species listed under the Act unless first authorized by a permit, except as a rule issued under section 4(d) of the Act applies to the species. These activities include import, export, take, and sale or offer for sale in interstate or foreign commerce. The Secretary of the Interior may permit these activities for endangered species for scientific purposes or enhancement of the propagation or survival of the species, provided the activities are consistent with the purposes of the Act. In addition, for threatened species, permits may be issued for the above-listed activities, as well as zoological, horticultural, or botanical exhibition; education; and special purposes consistent with the Act. The Secretary of the Interior has delegated the authority to administer endangered and threatened species permit matters to the Director of the U.S. Fish and Wildlife Service. The Service's Division of Management Authority administers the permit program for the import or export of listed species, the sale or offer for sale in interstate and foreign commerce for nonnative listed species, and the take of nonnative listed wildlife within the United States.

## Previous Federal Action

In 1979, the Service published the Captive-bred Wildlife (CBW) regulations (44 FR 54002, September 17, 1979) to reduce Federal permitting requirements and facilitate captive breeding of endangered and threatened species under certain conditions. These conditions include:

(1) A person may become registered with the Service to conduct otherwise prohibited activities when the activities can be shown to enhance the propagation or survival of the species;

(2) Interstate commerce is authorized only when both the buyer and seller are registered for the same species;

(3) The registration is only for live, mainly nonnative endangered or threatened wildlife that was born in captivity in the United States (although the Service may determine that a native species is eligible for the registration; to date, the only native species granted eligibility under the registration is the Laysan duck *(Anas laysanensis));*

(4) Registration does not authorize activities with non-living wildlife, a provision that is intended to discourage the propagation of endangered or threatened wildlife for consumptive markets; and

(5) The registrants are required to maintain written records of authorized activities and report them annually to the Service. The CBW registration has provided zoological institutions and breeding operations the ability to move animals quickly between registered institutions for breeding purposes.

In 1993, the Service amended the CBW regulations at 50 CFR 17.21(g) (58 FR 68323, December 27, 1993) to eliminate public education through exhibition of living wildlife as the sole justification for the issuance of a CBW registration. That decision was based on the Service's belief that the scope of the CBW system should be revised to relate more closely to its original intent, *i.e.,* the encouragement of responsible breeding that is specifically designed to help conserve the species involved (63 FR 48635; September 11, 1998).

In 1998, the Service amended the CBW regulations (63 FR 48634, September 11, 1998) to delete the requirement to obtain a CBW registration for holders of inter-subspecific crossed or generic tigers (*i.e.,* specimens not identified or identifiable as members of Bengal, Sumatran, Siberian, or Indochinese subspecies *(Panthera tigris tigris, P. t. sumatrae, P. t. altaica,* and *P. t. corbetti,* respectively)). Certain otherwise prohibited activities with these specimens were authorized only when the activities were shown to enhance the propagation or survival of the species, provided the principal purpose was to facilitate captive breeding. Although the submission of a written annual report was not required, holders of these specimens had to maintain

accurate written records of activities, including births, deaths, and transfers of specimens, and make the records accessible to Service agents for inspection at reasonable hours as provided for in 50 CFR 13.46 and 13.47. The exemption for inter-subspecific crossed or generic tigers was based on the lack of conservation value of these specimens due to their mixed or unknown genetic composition. The intention behind the exemption was for the Service to focus its oversight on populations of ''purebred'' animals of the various tiger subspecies to further their conservation in the wild, while recognizing that generic tigers that were currently held by zoological facilities could be used to educate the public about the ecological role and conservation needs of the species. Even with this exemption, inter-subspecific crossed or generic tigers were still protected under the Act and those activities that did not constitute authorized activities under the CBW program, such as the interstate sale of generic tigers solely for education purposes or display purposes, would require prior authorization of an ESA permit.

On August 22, 2011, the Service proposed to amend the CBW regulations that implement the Act by removing inter-subspecific crossed or generic tigers from paragraph (g)(6) of 50 CFR 17.21 (76 FR 52297). The public was provided with a 30-day comment period to submit their views and comments on the proposed rule. However, due to the large volume of comments, the Service published a notice on September 21, 2011 (76 FR 58455), extending the comment period for an additional 30 days. This comment period ended on October 21, 2011. Since that time, the Service has received no new substantive information that would affect this rule.

*Species Status*

The wild tiger was once abundant throughout Asia. At the end of the 19th century, an estimated 100,000 tigers occurred in the wild (Nowak 1999, p. 828), but by the late 1990s, the estimated population had declined to 5,000–7,000 animals (Seidensticker et al. 1999, p. xvii). Today's population in the wild is thought to be 3,000–5,000 individuals, according to the IUCN (International Union for Conservation of Nature) Red List estimate (Chundawat et al. 2010, unpaginated), with no more than 2,500 mature breeding adults (Williamson and Henry 2008, pp. 7, 43). The once-abundant tiger now lives in small, fragmented groups, mostly in protected forests, refuges, and national parks (FWS 2010a, p. 1). The species occupies only about 7 percent of its original range, and in the past decade, the species' range has decreased by as much as 41 percent (Dinerstein et al. 2007, p. 508).

For many years, the international community has expressed concern about the status of tigers in the wild and the risk that captive tigers, if used for consumptive purposes, may sustain the demand for tiger parts, which would ultimately have a detrimental effect on the survival of the species in the wild. An estimated 5,000 captive tigers occur on China's commercial tiger farms, where tigers are being bred intensively and produce more than 800 animals each year (Williamson and Henry 2008, p. 40). Tiger body parts, such as organs, bones, and pelts, are in demand not only in China, but also on the global black market. Organs and bones are used in traditional medicines, which are purchased by consumers who believe the parts convey strength, health, and virility.

Current regulations under the ESA prohibit the taking of any tiger, including generic tigers, and there is no clear evidence that the U.S. captive tiger population has played a role in illegal international trade. However, in 2005, Werner (p. 24) estimated that 4,692 tigers were held in captivity in the United States. Approximately 264 tigers were held in institutions registered with the Association of Zoos and Aquariums (AZA), 1,179 in wildlife sanctuaries, 2,120 in institutions registered by the U.S. Department of Agriculture (USDA), and 1,120 in private hands. In 2008, Williamson and Henry stated that as many as 5,000 tigers are in captivity in the United States, but cautioned that, given the current State and Federal legal framework that regulates U.S. captive tigers, the exact size of the population is unknown (Williamson and Henry 2008).

*Conservation Status*

The tiger is a species of global concern, is classified as endangered in the IUCN Red List (IUCN 2010), and is protected by a number of U.S. laws and treaties. It is listed as endangered under the Act. Section 3 of the Act defines an ''endangered species'' as ''any species which is in danger of extinction throughout all or a significant portion of its range.'' The listing is at the species level and, thus, includes all subspecies of tiger (including those that are of unknown subspecies, referred to as ''generic'' tigers) and inter-subspecific crosses.

The species is also protected by the Convention on International Trade in Endangered Species of Wild Fauna and Flora (CITES). Under this treaty, 178 member countries (Parties) work together to ensure that international trade in protected species is not detrimental to the survival of wild populations. The United States and all the tiger range countries are Parties to CITES. The tiger is listed in Appendix I, which includes species threatened with extinction whose trade is permitted only under exceptional circumstances, and which generally precludes commercial trade. The United States has a long history of working within CITES to promote tiger conservation and has been a leader in supporting strong actions within CITES for tigers, including strict controls on captive-bred animals. In 2007 at the 14th meeting of the Conference of the Parties to CITES (CoP14), we were closely involved in drafting Decision 14.69, which calls on countries with intensive commercial breeding operations of tigers to implement measures to restrict the captive population to a level supportive only to conserving wild tigers, and for tigers not to be bred for trade in their parts and products. Although the decision was primarily directed at large commercial breeding operations such as those found in China, we are aware of the large number of captive tigers in the United States and the need to be vigilant in monitoring these tigers as well.

The tiger is afforded additional protection under the Captive Wildlife Safety Act (CWSA) and the Rhinoceros and Tiger Conservation Act (RTCA, 16 U.S.C. 5301 *et seq.*). The CWSA amended the Lacey Act (16 U.S.C. 3371 *et seq.*) to address concerns about public safety and the growing number of big cats, including tigers, in private hands in the United States. The law and its regulations make it illegal to import, export, transport, sell, receive, acquire, or purchase in interstate or foreign commerce any live big cats except by certain exempt entities. Entities exempt from the CWSA include a person, facility, or other entity licensed by the USDA's Animal and Plant Health Inspection Service under the Animal Welfare Act to possess big cats (typically zoos, circuses, and researchers) or registered to transport big cats; State colleges, universities, and agencies; State-licensed wildlife rehabilitators and veterinarians; and wildlife sanctuaries that meet certain criteria.

The RTCA is another powerful tool in combating the international trade in products containing tiger parts. It prohibits the sale, import, and export of products intended for human use and containing, or labeled or advertised as

containing, any substance derived from tiger and provides for substantial criminal and civil penalties for violators. The RTCA also establishes a fund that allows the Service to grant money in support of on-the-ground tiger conservation efforts, such as anti-poaching programs, habitat and ecosystem management, development of nature reserves, wildlife surveys and monitoring, management of human-wildlife conflict, and public awareness campaigns (FWS 2010b. p. 1).

*Concerns Raised and Recommendations*

The World Wildlife Fund, TRAFFIC North America, other nongovernmental organizations (NGOs), and the public have expressed concerns about the potential role U.S. captive tigers may play, or could potentially play, in the trade in tiger parts. In July 2008, TRAFFIC published a report titled, *Paper Tigers? The Role of the U.S. Captive Tiger Population in the Trade in Tiger Parts* (Williamson and Henry 2008). The report found no indication that U.S. tigers currently are entering domestic or international trade as live animals or as parts and products. However, given the precarious status of tigers in the wild and the potential that U.S. captive tigers could enter trade and undermine conservation efforts, TRAFFIC made several recommendations to close potential loopholes in current Federal and State regulations to avoid the use of captive U.S. tigers in trade. One of those recommendations was for the Service to eliminate the exemption under 50 CFR 17.21(g)(6) for holders of inter-subspecific crossed or generic tigers from the requirements to register and submit annual reports under the CBW regulations.

**Summary of Comments and Our Responses**

In our proposed rule (August 22, 2011; 76 FR 52297), we asked interested parties to submit comments or suggestions regarding the proposal to eliminate inter-subspecific crossed or generic tigers from the regulation at 50 CFR 17.21(g). The original comment period for the proposed rule lasted for 30 days, ending September 21, 2011. The comment period was extended, however, on September 21, 2011 (76 FR 58455), to allow for an additional 30 days to accommodate the large number of commenters. The extended comment period ended on October 21, 2011. We received 15,199 individual comments during the two comment periods. The vast majority of the comments (approximately 15,000) either supported the proposed rule as written or stated that it was not strong enough to address captive breeding of inter-subspecific crossed or generic tigers. We received 109 comments from individuals or organizations that opposed the proposed rule. The remaining 79 comments were either irrelevant to the proposed rule or indecipherable.

*Issue 1:* Approximately 14,300 comments supported the proposed rule as written, stated that this change in the regulations would reduce the level of illegal trade in both captive and wild tigers, decrease the possibility of captive tigers being held in inhumane conditions, and reduce ''rampant'' breeding of captive tigers within the United States. However, many of these commenters were also concerned that the change in the regulation would result in the possible overcrowding of sanctuaries or unaccredited institutions that would receive unwanted adult tigers.

*Our response:* The change in regulations would provide for greater control over captive tigers within the United States. As the CBW regulations are currently written, individuals or institutions that have been housing inter-subspecific crossed or generic tigers could move tigers across State lines for commercial activities without registering under the CBW regulations. While these activities are required to be undertaken in association with a managed breeding program to ensure that deleterious breeding (*i.e.,* inbreeding or inappropriate crosses) does not occur, we have evidence that these requirements may have been violated in some number of cases. Therefore, based on this conclusion, we are acting consistently with the purposes of the Act to limit the authorization of interstate commerce and commercial movement of tigers under the CBW regulations to situations where the end-use of the tiger is to enhance the propagation or survival of the species in the wild by contributing to the conservation of the species.

However, this change in regulations would not directly result in the control of breeding of inter-specific crossed or generic tigers. The Act does not regulate intrastate activities that do not result in a take or the noncommercial interstate movement of a listed species. The only intrastate activity that the Act regulates is the take (*e.g.,* harming, harassing, or killing) of a listed species. Individuals or facilities that maintain such tigers can continue to breed tigers, sell them within their State, or move tigers across State lines for noncommercial purposes without obtaining authorization from us, as long as such activities do not result in a take of the species. However, it is possible that stricter regulation of the interstate commerce of these specimens may result in a reduction in breeding due to a smaller (*i.e.,* intrastate only) market for generic tigers.

It is also possible that, with this change in the CBW regulations and the potentially lower demand for tigers within the United States, individuals or facilities that currently hold inter-subspecific crossed or generic tigers will move their animals to sanctuaries or other zoo facilities, causing these facilities to become overcrowded. We do not believe that such movement will become a significant problem at most zoos and sanctuaries, which generally maintain a high standard of care and, in any case, are required by the Animal Welfare Act and other Federal and State laws and regulations to provide humane treatment for animals. A need may arise, however, for greater coordination between nongovernmental organizations, zoos, and sanctuaries to ensure that all inter-subspecific crossed or generic tigers that end up in sanctuaries or zoos receive adequate housing and care.

*Issue 2:* Of the nearly 15,000 comments that supported the rule in some form, 527 commenters were opposed to maintaining tigers in captivity at all. These commenters expressed a general belief that tigers should be left in the wild and that captive tigers should be released. While many of these comments supported the change in regulations as necessary, they also expressed the belief that this change should be only the first step that would eventually result in captive tigers being released into the wild and/or no longer bred in captivity.

*Our response:* As stated above, the Act does not prohibit the ownership of listed species, if the activities being carried out with these specimens do not violate any of the prohibitions of the Act. Therefore, if the animals were legally purchased and moved, the Act does not prohibit an individual or institution from maintaining or even breeding tigers. While we recognize that some people are opposed to maintaining exotic animals in captivity, we do not have the regulatory authority to prohibit such activities. Further, we do not believe that inter-subspecific crossed or generic tigers are suitable for release in the wild, both because they may not be genetically compatible with wild populations, and because, in most cases, they are not suitably conditioned for survival in the wild. Such animals either might starve or could become a menace to livestock and humans. However, we believe that, under the correct circumstances, maintaining

listed species in captivity—including tigers—can provide a conservation benefit to the species through education, research, and scientifically based breeding programs.

*Issue 3:* Many commenters (160) requested that we establish stricter regulations for tigers than what was proposed. Suggestions included establishing regulations that would prohibit anyone from holding or breeding tigers and allow only accredited zoos or sanctuaries to hold tigers. Many of these commenters expressed the desire to eliminate the use of tigers in circuses and animal exhibitions. The comments included suggestions to increase control over breeding programs and to have more frequent inspections of facilities to monitor for abuse or substandard facilities. Some commenters suggested microchipping all captive tigers. Some comments recommended stiffer penalties for poachers within the tiger native range.

*Our response:* As stated previously, the Act prohibits certain activities with listed species, but does not prohibit every activity that could involve such species. The Act does not regulate ownership or what an owner may do with a tiger as long as the owner obtained the tiger legally and does not harm or kill the tiger or engage in interstate commerce with the animal. We cannot establish regulations that go beyond the prohibitions of the Act, such as limiting ownership or breeding of tigers only to certain institutions or individuals. Anyone may engage in these activities if he or she otherwise complies with all other provisions of the Act, and as long as the actions are legal under other applicable laws (*e.g.,* those of the State in which the activities take place).

When we issue a permit or other authorization under the Act for otherwise prohibited activities, we do have the authority to conduct periodic inspections or otherwise have oversight of permitted activities. This authority, however, does not extend to activities outside the scope of the Act or for activities that are not regulated by the Act. Therefore, we do not have the ability to conduct regular inspections of breeding operations that do not require authorization from us. This type of inspection may be possible in some cases under the Animal Welfare Act, which is implemented by the USDA, but is outside the scope of this regulation. However, if we have evidence of illegal activity, we have the authority to carry out criminal investigations of any facility, whether or not it is permitted.

While we could require microchipping of tigers at a facility that has obtained a permit or other authorization from the Service, we cannot require the microchipping of all tigers within the United States. Microchipping some tigers may give us the ability to track the movement of live animals that are involved in interstate commerce (an otherwise prohibited activity), but we would not be able to track live tigers that do not fall under our jurisdiction. Further, microchipping is unlikely to assist us in investigating the illegal movement of tiger parts within the United States. We also do not have the authority or the resources to monitor and record the birth, death, or transfer of all tigers in the United States. Microchipping a portion of the captive tigers in the United States for tracking purposes might give us a limited picture of the movement and ownership of these animals in the United States, but we do not believe that any limited benefits would outweigh the cost and administrative burden of microchipping and tracking these animals.

We strongly encourage and support programs established by tiger range countries to control and ultimately eliminate poaching of wild tigers. We have been able to fund a variety of anti-poaching programs through various grant programs, including grants under the RTCA. We have also been actively involved in efforts through CITES to assist range countries in monitoring and controlling illegal trade in tigers. We do not have any authority, however, to establish stricter regulations regarding poaching in other countries.

*Issue 4:* One commenter was of the opinion that the exemption from the CBW registration process violated section 10(c) of the Act since it did not allow the public an opportunity to comment on the merits of activities involving inter-specific crossed or generic tigers.

*Our response:* By removing the exemption and requiring the submission of an application to either request a permit or register under the CBW regulations, the public will now have an opportunity to comment on the merits of any application to conduct otherwise prohibited activities with tigers.

*Issue 5:* Many commenters (109) were opposed to removing the exemption. In general, they believe that inter-subspecific crossed or generic tigers contribute to conservation primarily through education, but also by acting as a source of tigers within the United States. Many of these commenters felt that requiring registration under the CBW regulations or requiring a permit to conduct otherwise prohibited activities would ultimately lead to the demise of captive tigers in the United States. Many of these commenters expressed their concern that wild tigers will go extinct in the near future due to habitat loss and poaching, and, therefore, captive-bred tigers are needed to ensure that the species does not go extinct.

*Our response:* The CBW regulations facilitate the captive breeding of species listed under the Act for conservation purposes by allowing registrants to conduct interstate commerce and move specimens across State lines. The Service recognizes that well-managed breeding programs focusing on specific subspecies and that maintain good genetic diversity among the specimens within the breeding program can provide a long-term benefit to listed species by producing a pool of viable candidates for future reintroduction. We have also stated in the 1998 final rule exempting inter-subspecific crossed or generic tigers from the CBW registration process (63 FR 48638) that inter-subspecific crossed or generic tigers should not be used for conservation-oriented breeding, but could be used for exhibition in a manner designed to educate the public about the ecological role and conservation needs of the species.

The Act does not regulate intrastate activities other than take, such as ownership and breeding, nor does it regulate noncommercial interstate transfers of listed species (*e.g.,* gifts, loans, and exchanges of animals of the same species for genetic management purposes). Removing the exemption for inter-subspecific crossed or generic tigers from the CBW regulations will require anyone who is selling an inter-subspecific crossed or generic tiger across State lines to either register under the CBW regulations or obtain an interstate commerce permit. The Service does not believe that the action taken in this final rule will adversely affect the conservation breeding of tigers within the United States, nor lead to the demise of captive tigers within the United States.

*Issue 6:* Several commenters expressed the opinion that enough laws or restrictions are already in place to ensure that the legality of activities carried out with tigers. Two commenters pointed directly to the RTCA as a powerful tool to combat illegal trade of tiger parts within the United States. These commenters stated that, since there is no proof of the use of U.S. captive tigers in traditional medicines, the Service does not need to impose additional regulations on tiger breeders in the United States. Five commenters

felt that, because there is no proof of such illegal trade within the United States, such trade is not a threat, and, therefore, this rule is arbitrary and capricious under the Administrative Procedure Act.

*Our response:* While we agree with the commenters on the benefits of the RTCA in combating illegal trade in tiger parts, we do not agree that the existing regulations adequately provide for the conservation of tigers. With the exemption for inter-subspecific crossed or generic tigers, it was difficult to determine whether activities involving tigers were legal because there was no requirement for a permit or other authorization. Monitoring of activities was also hampered by our inability to determine if tigers bred and sold under the exemption were actually inter-subspecific crossed or generic animals. By removing the exemption, we are reinstating regulations that already cover most other endangered and threatened species, thus ensuring better oversight and monitoring. This requirement will be another tool that can be used, in conjunction with the RTCA and other laws, to curb potentially illegal activities within the United States. While we have no evidence indicating that captive tigers are currently being illegally killed for their parts within the United States, we believe that, if wild tiger populations continue to decline, demand for captive tigers and their parts may increase. The final rule is reasonable in light of this potential threat and evidence of continuing declines in tiger population and range, and we have fully explained our reasons for removing the exemption.

*Issue 7:* Two commenters felt that we made contradictory statements in the proposed rule when we said that individuals who wished to carry out otherwise prohibited activities with inter-subspecific crossed or generic tigers would need to register under the CBW regulations, but then also stated that we did not believe the breeding of inter-subspecific crossed or generic tigers provided a conservation benefit. In other words, they concluded that we would not actually register anyone with inter-subspecific crossed or generic tigers because of our perceived lack of conservation value of such animals.

*Our response:* The commenters are correct that we do not believe that breeding inter-subspecific crossed or generic tigers, in and of itself, provides a conservation benefit, since the tigers are of unknown or mixed genetic origin. As such, inter-subspecific crossed or generic tigers would not be good candidates for a well-managed conservation-oriented breeding program. In addition, it is unlikely that we would register an operation for the sole purpose of selling tigers across State lines, since a CBW registration is for the purpose of exchanging stock with other breeders or to hold surplus animals not needed for a breeding program. This does not mean, however, that we could not authorize individual permits if the activity being conducted enhanced the propagation or survival of the species in the wild. Under our regulations, it is possible to authorize interstate commerce for an inter-subspecific crossed or generic tiger if the parties involved in the transaction are carrying out activities that enhance the propagation or survival of the species. While it is unlikely that such a commercial transaction would provide a direct benefit to the species, such as reintroduction, there may be indirect benefits that could be obtained from the transaction.

It should also be noted that the requirement to show that authorizing an otherwise prohibited activity, such as interstate commerce, could be met through an individual or institution, or a group of individuals or institutions together, working to provide a benefit to the species in the wild. For example, if one or more zoological institutions were purchasing inter-subspecific crossed or generic tigers for educational and display purposes, they could provide support (*e.g.,* via the solicitation of donations from visitors) to carry out in-situ conservation efforts in the tiger's native range. The Service prefers a clear, ongoing commitment of several years on the part of the applicant to provide in-situ conservation or research support. This ongoing commitment could be fulfilled by a group of institutions working together to maximize their resources for the benefit of tigers in the wild.

*Issue 8:* Several commenters stated that inter-subspecific crossed or generic tigers have an educational value and, therefore, should still be exempt from the CBW registration to ensure that this benefit could continue. Many of these commenters felt that inter-subspecific crossed or generic tigers are ''ambassadors'' for the wild tiger and its conservation. One commenter stated that availability of such tigers within the United States removed pressure on wild populations to supply animals for exhibition purposes. One commenter, noting that the Service previously excluded education as a sole justification for registration under the CBW regulations, questioned the basis of this exclusion.

*Our response:* This rule does not address whether the display of inter-subspecific crossed or generic tigers has an educational value. It is possible that a professionally developed education program using inter-subspecific crossed or generic tigers could indirectly benefit the wild populations of tigers by raising public awareness of the plight of the tiger. Furthermore, no permit or other authorization, including a CBW registration, is necessary to conduct educational programs with such tigers, including crossing State lines to make presentations involving the animals. Given the number of inter-subspecific crossed or generic tigers within the United States, the commenter is correct that wild-caught tigers are not in demand for educational purposes. The purpose of this rule, however, is to reestablish the monitoring and oversight benefits of the CBW regulations to all specimens of tigers, not just purebred specimens.

On December 27, 1993, the Service published a final rule (58 FR 68323) that eliminated public education through exhibition of living wildlife as the sole justification for issuing a CBW registration under § 17.21(g). As one commenter correctly pointed out, the Service made the statement in the 1998 final rule exempting inter-subspecific crossed or generic tigers from the CBW registration process (63 FR 48638) that inter-subspecific crossed or generic tigers should not be used to enhance the propagation of the species, but could be used for exhibition in a manner designed to educate the public about the ecological role and conservation needs of the species. While individuals are not precluded from continuing to provide educational opportunities to the public through the display of inter-subspecific crossed or generic tigers, an educational purpose alone is not enough to support CBW registration per the 1993 rule. The basis for excluding education as the sole justification for a CBW registration was discussed in the final rule on that issue (58 FR 68323) and is outside the scope of this rulemaking.

*Issue 9:* Two commenters raised questions about the listing status of the inter-subspecific crossed or generic tiger. One commenter questioned whether inter-subspecific crossed or generic tigers meet the standard of listing under the Act and, therefore, whether they are properly subject to regulation by the Service. Another commenter proposed that inter-subspecific crossed or generic tigers within the United States are a new subspecies, the ''American tiger.'' This commenter provided a description of six ''varieties'' of ''American tigers'' that should be, as a group, a new subspecies.

*Our response:* Whether these animals meet the listing criteria under section 4 of the Act is an issue outside the scope of this rulemaking process. Whether inter-subspecific crossed or generic tigers within the United States would constitute a separate subspecies is a matter that should be addressed by taxonomists and is, therefore, outside the scope of this rulemaking process as well. However, currently the tiger is listed at the species level, not at the subspecies level, so all tiger specimens are covered by the listing.

*Issue 10:* One commenter noted a study by the National Cancer Institute that found that one ''generic'' tiger in seven is actually a purebred member of a recognized subspecies, raising the question of how individuals can determine if their tiger is pure or an inter-subspecific crossed or generic tiger. Another commenter raised the question of whether this rule would require genetic testing of tigers and how the cost of that testing would be covered.

*Our response:* The first commenter was probably referring to a study published in 2008 in *Current Biology*[1] that found 14–23 percent (approximately 1 in 7 or more) of the ''generic'' tigers tested were shown to have a verifiable subspecies ancestry (*i.e.,* they are a pure subspecies). The tigers tested in this study came from locations in the United States and abroad. We note that our definition of ''generic tiger'' includes animals of unknown lineage. It is entirely possible that some animals of unknown lineage actually have a pure subspecies lineage, but the lack of information on their origin requires that they be treated as unknown for the purposes of conservation breeding.

Since pure and generic tigers would be treated the same in regards to permits issued under 50 CFR 17.22 (*i.e.,* interstate and foreign commerce, take, import, or export), there would be no requirement to test tigers within the United States. However, if the owner of a breeding operation wished to become a CBW registrant, that person would need to show how the tigers he or she holds would contribute to the genetic management of the species within the United States. If the owner is unable to document the source and, therefore, subspecies of their tigers, it may be necessary to conduct genetic testing on his/her tigers to prove that they are not inter-specific crossed animals. The cost of such testing would be his/her responsibility.

*Issue 11:* One commenter questioned the value of maintaining pure subspecies in captivity as a potential pool for reintroduction purposes if the plight of the wild tiger is so dire. The commenter's presumption was that zoos and private breeders do not have the capacity to maintain sufficient numbers of pure subspecies to provide enough specimens if reintroduction is needed. It is unclear whether the commenter meant that a need might develop to use tigers of mixed or unknown genetic ancestry for reintroduction purposes and that the survival of the species may rely on such tigers. However, the commenter expressed the view that efforts by the Service to limit the breeding of inter-subspecific crossed or generic tigers are counterintuitive to the conservation of the species.

*Our response:* The generally accepted approach to the captive breeding of tigers—or of any species—for conservation purposes is to maintain separate viable populations of each subspecies and to avoid, where possible, breeding tigers of unknown or questionable genetic heritage. Adequacy of founder representation and minimum viable population sizes are issues to be determined by conservation biologists and vary depending on the biological characteristics of the species, and are outside the scope of this rulemaking. The purpose of this rule is to establish a single approach to monitoring the otherwise prohibited activities involving any tiger within the United States.

*Issue 12:* One commenter felt that the display of inter-subspecific crossed or generic tigers could generate funds for in-situ conservation efforts and should, therefore, be encouraged.

*Our response:* We agree that the display of tigers, whether purebred subspecies or tigers of unknown genetic ancestry, could generate funds and resources for in-situ conservation efforts. This rule does not limit nor is it intended to discourage in-situ conservation efforts. The rule only provides the same level of monitoring and oversight for all tigers within the United States to ensure that activities carried out with this species are legal and consistent with the purposes of the Act.

**Removal of Inter-subspecific Crossed or Generic Tigers from 50 CFR 17.21(g)(6)**

We are amending the CBW regulations that implement the Act by removing inter-subspecific crossed or generic tiger *(Panthera tigris)* (*i.e.,* specimens not identified or identifiable as members of Bengal, Sumatran, Siberian, or Indochinese subspecies (*Panthera tigris tigris, P. t. sumatrae, P. t. altaica,* and *P. t. corbetti,* respectively)) from paragraph (g)(6) of 50 CFR 17.21. This action eliminates the exemption from registering and reporting under the CBW regulations by persons who want to conduct otherwise prohibited activities under the Act with live, inter-subspecific crossed or generic tigers born in the United States. This action does not alter the current listing of tigers. Inter-subspecific crossed or generic tigers remain listed as endangered under the Act, and a person would need to qualify for an exemption or obtain an authorization under the remaining statutory and regulatory requirements to conduct any prohibited activities.

We are changing the regulations to ensure that we maintain stricter control over the commercial movement and sale of captive tigers in the United States. As stated in the comment section, we do not believe that breeding inter-subspecific crossed or generic tigers, in and of itself, provides a conservation benefit for the long-term survival of the species. Inter-subspecific tiger crosses and animals of unknown genetic ancestry could not be used for maintaining genetic viability and distinctness of specific tiger subspecies. Tigers of unknown or mixed genetic origin are typically not maintained in a manner to ensure that inbreeding or other inappropriate matings of animals do not occur. By exempting inter-subspecific crossed or generic tigers from the CBW registration process in 1998, we had inadvertently suggested that the breeding of these tigers, in and of itself, qualifies as conservation. By removing the exemption, we reinforce the value of conservation breeding of individual tiger subspecies through the CBW program.

As stated in the proposed rule, we are unaware of any evidence that tiger parts are entering into trade from the captive U.S. population of tigers. However, we recognize that the use of tiger parts and products, including in traditional medicine, poses a significant threat to wild tiger populations. The United States has worked vigorously with other CITES countries to encourage not only the adoption of measures to protect wild tiger populations from poaching and illegal trade, but also the implementation of measures to ensure that breeding of tigers in captivity supports conservation goals and that tigers are not bred for trade in parts and products. While we do not have

---

[1] Shu-Jin Luo, Warren E. Johnson, Janice Martenson, Agostinho Antunes, Paolo Martelli, Olga Uphyrkina, Kathy Traylor-Holzer, James L.D. Smith and Stephen J. O'Brien. 2008. ''Subspecies Genetic Assignments of Worldwide Captive Tigers Increase Conservation Value of Captive Populations''. *Current Biology,* 18, 592–596.

evidence that parts from captive-bred tigers in the United States are currently entering into international trade, we believe that demand for tiger parts could increase in the future. This threat, combined with the precarious status of tigers in the wild, lead us to conclude that the oversight provided by this final rule will benefit the species.

The previous CBW exemption also created enforcement difficulties. Specifically, law enforcement cases have hinged on whether activities the Service has identified as illegal were actually exempted under the current regulations. By removing the exemption, persons engaged in otherwise prohibited activities will need to obtain a permit or register under the CBW program, giving the Service greater ability to bring enforcement cases for violations involving tigers.

It should be stressed, however, that removing the exemption for inter-subspecific crossed or generic tigers would not result in regulations by the Service of ownership, intrastate commerce, or noncommercial movement of these tigers across State lines, as long as they are not killed or harmed. These activities are not prohibited by the Act, and we have no authority to prohibit or otherwise regulate them.

Finally, we reorganized paragraph (g)(6), redesignating subparagraphs to make the section clearer. With the exception of removing inter-subspecific crossed or generic tigers, the text is essentially the same as it previously appeared in 50 CFR 17.21(g)(6).

**Required Determinations**

*Regulatory Planning and Review (Executive Orders 12866 and 13563):* Executive Order 12866 provides that the Office of Information and Regulatory Affairs (OIRA) in the Office of Management and Budget will review all significant rules. OIRA has determined that this rule is significant because it may create a serious inconsistency or otherwise interfere with an action taken or planned by another agency.

Executive Order 13563 reaffirms the principles of E.O. 12866 while calling for improvements in the nation's regulatory system to promote predictability, to reduce uncertainty, and to use the best, most innovative, and least burdensome tools for achieving regulatory ends. The executive order directs agencies to consider regulatory approaches that reduce burdens and maintain flexibility and freedom of choice for the public where these approaches are relevant, feasible, and consistent with regulatory objectives. E.O. 13563 emphasizes further that regulations must be based on the best available science and that the rulemaking process must allow for public participation and an open exchange of ideas. We have developed this rule in a manner consistent with these requirements.

*Regulatory Flexibility Act:* Under the Regulatory Flexibility Act (as amended by the Small Business Regulatory Enforcement Fairness Act (SBREFA) of 1996), whenever a Federal agency is required to publish a notice of rulemaking for any proposed or final rule, it must prepare and make available for public comment a regulatory flexibility analysis that describes the effect of the rule on small entities (*i.e.,* small businesses, small organizations, and small government jurisdictions) (5 U.S.C. 601 *et seq.*). However, no regulatory flexibility analysis is required if the head of an agency certifies that the rule would not have a significant economic impact on a substantial number of small entities. Thus, for a regulatory flexibility analysis to be required, impacts must exceed a threshold for "significant impact" and a threshold for a "substantial number of small entities." See 5 U.S.C. 605(b). SBREFA amended the Regulatory Flexibility Act to require Federal agencies to provide a statement of the factual basis for certifying that a rule would not have a significant economic impact on a substantial number of small entities.

The U.S. Small Business Administration (SBA) defines a small business as one with annual revenue or employment that meets or is below an established size standard. We expect that the majority of the entities involved in taking, exporting, re-importing, and selling in interstate or foreign commerce of inter-subspecific crossed or generic tigers would be considered small as defined by the SBA.

Currently, businesses conducting activities with inter-subspecific crossed or generic tigers are exempt from registration under the CBW regulations, if the activities are consistent with the purposes of the ESA and CBW program. This rule would require businesses that are otherwise carrying out these activities to apply for authorization under the Act and pay an application fee of $100 for a one-time interstate commerce permit or $200 to register under the CBW program (valid for 5 years).

Currently, there is no Federal or State mechanism in place that tracks or monitors the extent of business activities involving generic tigers. With the exemption from registration by facilities that are conducting activities in compliance with the current CBW regulations, FWS does not have data on how many businesses are involved in the interstate commerce of generic tigers, the number of businesses for which an interstate commerce permit or registration in the CBW program will be a viable option, and the economic impacts if prospective applicants are unable to either secure an interstate commerce permit or registration in the CBW program. While the U.S. Department of Agriculture regulates some aspects of holding large cats like tigers, their authority does not extend to all facilities that maintain tigers. As such, there is not a centralized database or collection of data that would identify the number of facilities within the United States. While some State governments may monitor or even regulate some aspects of holding tigers, either pure-bred or generic, there is not a universal approach that would render any significant data on those facilities that hold tigers throughout the United States. Nonetheless, based on the comments received during the public comment period, FWS anticipates that the number of affected small businesses is small and either registration in the CBW program or an interstate commerce permit will be a viable option at a modest expense. Therefore, the regulatory change is not major in scope and will create only a modest financial or paperwork burden on the affected members of the public.

We, therefore, certify that this rule would not have a significant economic effect on a substantial number of small entities as defined under the Regulatory Flexibility Act (5 U.S.C. 601 *et seq.*). A Regulatory Flexibility Analysis is not required. Accordingly, a Small Entity Compliance Guide is not required.

*Small Business Regulatory Enforcement Fairness Act:* This rule is not a major rule under 5 U.S.C. 804(2), the Small Business Regulatory Enforcement Fairness Act. This rule:

a. Would not have an annual effect on the economy of $100 million or more. This rule removes the inter-subspecific crossed or generic tigers from the exemption to register under the CBW regulations. Individuals and captive-breeding operations would need to obtain endangered species permits or other authorization to engage in certain otherwise prohibited activities. This rule would not have a negative effect on the economy. It will affect all businesses, whether large or small, the same. There is not a disproportionate share of benefits for small or large businesses.

b. Would not cause a major increase in costs or prices for consumers;

individual industries; Federal, State, tribal, or local government agencies; or geographic regions. This rule would result in a small increase in the number of applications for permits or other authorizations to conduct otherwise prohibited activities with inter-subspecific crossed or generic tigers.

c. Would not have significant adverse effects on competition, employment, investment, productivity, innovation, or the ability of U.S.-based enterprises to compete with foreign-based enterprises.

*Unfunded Mandates Reform Act:* Under the Unfunded Mandates Reform Act (2 U.S.C. 1501, *et seq.*):

a. This rule would not significantly or uniquely affect small governments. A Small Government Agency Plan is not required.

b. This rule would not produce a Federal requirement of $100 million or greater in any year and is not a "significant regulatory action" under the Unfunded Mandates Reform Act.

*Takings:* Under Executive Order 12630, this rule would not have significant takings implications. A takings implication assessment is not required. This rule is not considered to have takings implications because it allows individuals to obtain authorization for otherwise prohibited activities with the inter-subspecific crossed or generic tigers when issuance criteria are met.

*Federalism:* This revision to part 17 does not contain significant Federalism implications. A Federalism Assessment under Executive Order 13132 is not required.

*Civil Justice Reform:* Under Executive Order 12988, the Office of the Solicitor has determined that this rule does not unduly burden the judicial system and meets the requirements of subsections 3(a) and 3(b)(2) of the Order.

*Paperwork Reduction Act:* This rule does not contain any new information collections or recordkeeping requirements for which Office of Management and Budget (OMB) approval is required under the Paperwork Reduction Act of 1995 (44 U.S.C. 3501 *et seq.*). OMB has reviewed and approved the information collection requirements for the Division of Management Authority's permit program and assigned OMB Control Number 1018–0093, which expires May 31, 2017. We may not conduct or sponsor and a person is not required to respond to a collection of information unless it displays a currently valid OMB control number.

*National Environmental Policy Act (NEPA):* The Service has determined that this action is a regulatory change that is administrative and procedural in nature. This rule requires that persons engaging in otherwise prohibited activities with inter-subspecific crossed or generic tigers register under the CBW regulations at 50 CFR 17.21(g), but does not change the standards in regard to prohibited activities or exemptions from these prohibitions in any way. Previously, any otherwise prohibited activity with an inter-subspecific crossed or generic tiger had to be for the purpose of enhancing the propagation or survival of the species, and that standard has not changed. Other requirements such as limitations with respect to nonliving wildlife, identification of animals to be re-imported, requirements for animals to be permanently exported, and recordkeeping requirements have not changed. The difference is that persons conducting these activities with inter-subspecific crossed or generic tigers that previously did not have to register will now have to register with the Service. As such, the amendment is categorically excluded from further NEPA review as provided by 43 CFR 46.210(i), of the Department of the Interior Implementation of the National Environmental Policy Act of 1969 final rule (73 FR 61292; October 15, 2008). No further documentation will be made.

*Government-to-Government Relationship with Tribes:* Under the President's memorandum of April 29, 1994, "Government-to-Government Relations with Native American Tribal Governments" (59 FR 22951) and 512 DM 2, we have evaluated possible effects on federally recognized Indian Tribes and have determined that there are no effects.

*Energy Supply, Distribution or Use:* Executive Order 13211 pertains to regulations that significantly affect energy supply, distribution, and use. This rule would not significantly affect energy supplies, distribution, and use. Therefore, this action is a not a significant energy action and no Statement of Energy Effects is required.

*Data Quality Act:* In developing this rule, we did not conduct or use a study, experiment, or survey requiring peer review under the Data Quality Act (Pub. L. 106–554).

### References Cited

A complete list of references cited in this rulemaking is available on the Internet at *http://www.regulations.gov* at Docket No. FWS–R9–IA–2011–0027 and upon request from the person listed in **FOR FURTHER INFORMATION CONTACT**.

### List of Subjects in 50 CFR Part 17

Endangered and threatened species, Exports, Imports, Reporting, and recordkeeping requirements, Transportation.

### Regulation Promulgation

For the reasons given in the preamble, we are amending part 17, subchapter B of chapter I, title 50 of the Code of Federal Regulations, as follows:

### PART 17—[AMENDED]

■ 1. The authority citation for part 17 continues to read as follows:

**Authority:** 16 U.S.C. 1361–1407; 1531–1544; 4201–4245; unless otherwise noted.

■ 2. Amend § 17.21 by revising paragraph (g)(6) to read as set forth below:

### § 17.21  Prohibitions.

\* \* \* \* \*

(g) \* \* \*

(6) *Exemption from registration requirement.* (i) If the conditions in paragraph (g)(6)(ii) of this section are met, then any person subject to the jurisdiction of the United States seeking to engage in any of the activities authorized by paragraph (g)(1) of this section may do so without first registering with the Service with respect to the following species:

(A) The bar-tailed pheasant *(Syrmaticus humiae)*, Elliot's pheasant *(S. ellioti)*, Mikado pheasant *(S. mikado)*, brown eared pheasant *(Crossoptilon mantchuricum)*, white eared pheasant *(C. crossoptilon)*, cheer pheasant *(Catreus wallichii)*, Edward's pheasant *(Lophura edwardsi)*, Swinhoe's pheasant *(L. swinhoii)*, Chinese monal *(Lophophorus lhuysii)*, and Palawan peacock pheasant *(Polyplectron emphanum)*;

(B) Parakeets of the species *Neophema pulchella* and *N. splendida;*

(C) The Laysan duck *(Anas laysanensis);* and

(D) The white-winged wood duck *(Cairina scutulata).*

(ii) *Conditions for exemption to register.* The following conditions must exist for persons dealing with the species listed in paragraph (g)(6)(i) of this section to be eligible for exemption from the requirement to register with the Service:

(A) The purpose of the activity is to enhance the propagation or survival of the affected exempted species.

(B) Such activity does not involve interstate or foreign commerce, in the course of a commercial activity, with respect to nonliving wildlife.

(C) Each specimen to be reimported is uniquely identified by a band, tattoo, or other means that was reported in writing to an official of the Service at a

port of export prior to export of the specimen from the United States.

(D) No specimens of the taxa in paragraph (g)(6)(i) of this section that were taken from the wild may be imported for breeding purposes absent a definitive showing that the need for new bloodlines can be met only by wild specimens, that suitable foreign-bred, captive individuals are unavailable, and that wild populations can sustain limited taking. In addition, an import permit must be issued under § 17.22.

(E) Any permanent exports of such specimens meet the requirements of paragraph (g)(4) of this section.

(F) Each person claiming the benefit of the exception in paragraph (g)(1) of this section must maintain accurate written records of activities, including births, deaths, and transfers of specimens, and make those records accessible to Service agents for inspection at reasonable hours as set forth in §§ 13.46 and 13.47 of this chapter.

\*    \*    \*    \*    \*

Dated: March 24, 2016.

**Michael J. Bean,**
*Principal Deputy Assistant Secretary for Fish and Wildlife and Parks.*
[FR Doc. 2016–07762 Filed 4–5–16; 8:45 am]
**BILLING CODE 4333–15–P**

---

# DEPARTMENT OF COMMERCE

## National Oceanic and Atmospheric Administration

### 50 CFR Part 679

[Docket No. 150916863–6211–02]

RIN 0648–XE557

### Fisheries of the Exclusive Economic Zone Off Alaska; Pacific Cod by Catcher Vessels Using Trawl Gear in the Bering Sea and Aleutian Islands Management Area

**AGENCY:** National Marine Fisheries Service (NMFS), National Oceanic and Atmospheric Administration (NOAA), Commerce.

**ACTION:** Temporary rule; closure.

---

**SUMMARY:** NMFS is prohibiting directed fishing for Pacific cod by catcher vessels using trawl gear in the Bering Sea and Aleutian Islands management area (BSAI). This action is necessary to prevent exceeding the B season apportionment of the 2016 Pacific cod total allowable catch allocated to trawl catcher vessels in the BSAI.

**DATES:** Effective 1200 hours, Alaska local time (A.l.t.), April 4, 2016, through 1200 hours, A.l.t., June 10, 2016.

**FOR FURTHER INFORMATION CONTACT:** Josh Keaton, 907–586–7228.

**SUPPLEMENTARY INFORMATION:** NMFS manages the groundfish fishery in the BSAI exclusive economic zone according to the Fishery Management Plan for Groundfish of the Bering Sea and Aleutian Islands Management Area (FMP) prepared by the North Pacific Fishery Management Council under authority of the Magnuson-Stevens Fishery Conservation and Management Act. Regulations governing fishing by U.S. vessels in accordance with the FMP appear at subpart H of 50 CFR part 600 and 50 CFR part 679.

The B season apportionment of the 2016 Pacific cod total allowable catch (TAC) allocated to trawl catcher vessels in the BSAI is 5,460 metric tons (mt) as established by the final 2016 and 2017 harvest specifications for groundfish in the BSAI (81 FR 14773, March 18, 2016).

In accordance with § 679.20(d)(1)(i), the Administrator, Alaska Region, NMFS (Regional Administrator), has determined that the B season apportionment of the 2016 Pacific cod TAC allocated to trawl catcher vessels in the BSAI will soon be reached. Therefore, the Regional Administrator is establishing a directed fishing allowance of 5,000 mt and is setting aside the remaining 460 mt as bycatch to support other anticipated groundfish fisheries. In accordance with § 679.20(d)(1)(iii), the Regional Administrator finds that this directed fishing allowance has been reached. Consequently, NMFS is prohibiting directed fishing for Pacific cod by catcher vessels using trawl gear in the BSAI.

After the effective date of this closure the maximum retainable amounts at § 679.20(e) and (f) apply at any time during a trip.

## Classification

This action responds to the best available information recently obtained from the fishery. The Assistant Administrator for Fisheries, NOAA (AA), finds good cause to waive the requirement to provide prior notice and opportunity for public comment pursuant to the authority set forth at 5 U.S.C. 553(b)(B) as such requirement is impracticable and contrary to the public interest. This requirement is impracticable and contrary to the public interest as it would prevent NMFS from responding to the most recent fisheries data in a timely fashion and would delay the closure of directed fishing for Pacific cod by catcher vessels using trawl gear in the BSAI. NMFS was unable to publish a notice providing time for public comment because the most recent, relevant data only became available as of March 31, 2016.

The AA also finds good cause to waive the 30-day delay in the effective date of this action under 5 U.S.C. 553(d)(3). This finding is based upon the reasons provided above for waiver of prior notice and opportunity for public comment.

This action is required by § 679.20 and is exempt from review under Executive Order 12866.

**Authority:** 16 U.S.C. 1801 *et seq.*

Dated: April 1, 2016.

**Emily H. Menashes,**
*Acting Director, Office of Sustainable Fisheries, National Marine Fisheries Service.*
[FR Doc. 2016–07905 Filed 4–1–16; 4:15 pm]
**BILLING CODE 3510–22–P**